(No. 16177.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE GARINES *et al.* Plaintiffs in Error.

*Opinion filed December 16, 1924.*

1. CRIMINAL LAW—*record must be free from error where evidence is conflicting.* Where the evidence is conflicting, the record, to sustain a conviction, must be reasonably free from substantial and prejudicial error.

2. SAME—*what remark of court is prejudicial.* Where counsel for the prosecution remarks that the defendant's evidence is "a lot of cooked-up stuff," a remark by the court, "We all know what it is; we are not blind," in answer to the objection of counsel for the defendant, is highly prejudicial.

3. SAME—*when case must be reversed because of improper impeachment of defendant's witnesses.* A defendant is entitled to a fair trial by the jury, and although there may be enough evidence to justify a conviction, where the court, over proper objections, permits counsel for the prosecution to ask improper, insinuating and prejudicial questions for the alleged purpose of impeachment of the defendant's witnesses who give testimony material to the defense, a judgment of conviction will be reversed and the cause remanded for a new·trial.

4. SAME—*what instruction as to self-defense is improper.* An instruction as to self-defense which is simply a copy of section 149 of the Criminal Code does not give the jury any accurate knowledge of the law of self-defense and should not be given.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. ·HARRY A. LEWIS, Judge, presiding.

THOMAS D. NASH, MICHAEL J. AHERN, and JAMES J. McDERMOTT, (THOMAS E. SWANSON, of counsel,) for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, CLYDE C. FISHER, and HENRY T. CHACE, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

The homicide which is the subject of investigation in this prosecution occurred in a feud between two groups of Greek gamblers operating near the intersection of Halsted street and Blue Island avenue, in the city of Chicago. This prosecution is for the killing of Anastasis Visvardis about 4:30 o'clock in the afternoon of June 29, 1923. He was a member of the faction headed by George Charahus, "king" of the Halsted street Greeks, who was killed about the same time. Plaintiff in error Angelo Barbas was chief of the Greek faction to which plaintiffs in error George Garines, Dennis Mandolatos and Sam Vithoulkas belonged. Plaintiffs in error were indicted and tried for the killing of Visvardis and were convicted of murder and their punishment fixed at life imprisonment.

The evidence for the State shows that plaintiffs in error conspired to kill deceased and that pursuant to this conspiracy Garines killed Visvardis in front of a coffee house conducted by Mandolatos at 740 South Halsted street, and that at the same time Barbas killed Charahus inside the same coffee house. According to the witnesses for the State, both parties killed were unarmed at the time and the killing was wholly unprovoked. Eight bullets entered the body of Visvardis and three that of Charahus.

Plaintiffs in error Garines and Barbas claim that the shooting was in self-defense, and Mandolatos and Vithoulkas claim that they were merely witnesses to the killing of Charahus and that they had conspired with no one to kill Visvardis. The evidence for the defense is to the effect that Visvardis assaulted Garines with a revolver the night before the day of the shooting and that Garines saved his life by jumping behind an automobile parked in the street while other parties disarmed Visvardis. Other witnesses testified that when Charahus heard of this he rebuked Visvardis and his associates for not using their guns, and told them that

if they did not know how to use their guns they ought to throw them in the ashcan. The theory of the defense is that the Charahus faction were under the impression that Garines and others of the Barbas faction had caused the police to close the gambling house owned by Visvardis, Dennis Lardas and others of the Charahus faction; that Charahus had said repeatedly that he did not need the aid of the police to rule in his district and that he could take care of his own affairs with his gun; and that there was a conspiracy among those of the Charahus faction to kill Barbas, Garines and others of the opposing faction. The evidence for the defense is to the effect that Charahus, Visvardis and Lardas were walking up and down the street in front of Mandolatos' coffee house; that finally Charahus went into the coffee house and Visvardis and Lardas took stations a short distance from the door; that when Charahus entered the coffee house Garines walked out; that as he stepped onto the sidewalk Lardas began shooting at him; that Garines returned the fire; that Visvardis stepped out from the side of the building and reached for his gun; that Garines shot him and he fell to the sidewalk; that when the shooting began outside, Charahus drew his gun from his pocket and Barbas grabbed his hand and engaged in a struggle with him, and that during this struggle Charahus was shot.

There are 1100 pages of testimony in this record. About a score of witnesses testified for the People and an equal number for the defense. In many respects the testimony of the witnesses for the prosecution is directly contradictory of the testimony of the witnesses for the defense. It was for the jury to determine which set of witnesses was telling the truth. Where the evidence is conflicting, as it is in this case, the record, to sustain a conviction, must be reasonably free from substantial and prejudicial error.

Nick Funtall, who operated an hotel at 717½ South Halsted street, testified that about three o'clock in the after-

noon of the day of the shooting Charahus came into the coffee house at 719 South Halsted street; that Visvardis, Lardas and Spiros Konstantatos were sitting at a table; that Charahus appeared angry and abused Visvardis and his companions for not using their guns in the altercation with Garines the evening before; that about an hour later he saw Charahus, Visvardis and Lardas walking up and down the sidewalk in front of Mandolatos' coffee house; that he left at this time on a street car and knew nothing about the shooting. The cross-examination by the assistant State's attorney was in part as follows:

Q. "Are you indicted for robbery now?

A. "I was arrested, but I don't know if I am indicted yet.

Q. "Were you indicted by the Federal government?

A. "I don't know if I am indicted.

Q. "In a bank robbery? Did the government arrest you?

A. "Yes.

Q. "For the robbery of the Atlas National Bank of $14,000 of liberty bonds?

A. "Yes.

Q. "Is that what you were arrested for?

A. "Yes, but my attorney will find out—

Q. "Is Mr. Nash your attorney?

A. "No.

Q. "And when were you arrested by the Federal authorities?

A. "In my place about three weeks ago; I am out on bonds now."

There was an objection to every question asked and the objection was promptly overruled without explanation. In reply to one of the objections the prosecutor said: "I will show who this witness is; it goes to his credibility." At another point the following colloquy took place:

Smith: "He is objecting to every question I ask.

Nash: "On this line I am, because it is improper.

Smith: "You think it's improper. Now, I submit to the court it is not improper. It goes to the credibility of this witness as to whether the jury can believe him on anything."

Gus Michas testified on behalf of defendants that he operated the crap game for Barbas; that about two weeks before the day of the shooting Charahus came into Barbas' gambling house about 1:15 A. M. and asked Barbas why he had not closed his house at 1:00 o'clock; that Barbas replied that he was busy and wanted to remain open about twenty minutes longer; that Charahus told him if he did not close his place at 1:00 o'clock he (Charahus) would close it with his own gun; that Barbas replied that in the future he was going to keep his place open all night, and that Charahus said that if he did he would fix him; that on the date of the shooting he walked past Mandolatos' coffee house and saw Charahus, Visvardis and Lardas walking up and down the sidewalk in front of the place; that as he passed them he heard Charahus say to Visvardis, "Why do you carry that gun in your pocket? Why don't you use it?" that he went to a coffee house in the neighborhood and later to a barber shop across the street from the scene of the shooting; that during all this time Charahus, Lardas and Visvardis were walking up and down the sidewalk in front of Mandolatos' coffee house; that he sat down in a barber chair to be shaved and that while he was being shaved he heard a shot; that he looked out of the window and saw Garines shooting toward the north and Lardas toward the south; that Visvardis was standing near Lardas and during the shooting fell to the sidewalk; that George Mistakus ran to the body of Visvardis, took his gun and ran away with it. During the cross-examination of this witness the following took place:

Q. "Were you ever in the penitentiary?
A. "Yes, sir.

314—27

Q. "What penitentiary were you in?

A. "Jackson, Michigan.

Q. "What for?

A. "Robbery.

Q. "When was the robbery committed?

A. "In 1913.

Q. "Where were you arrested?

A. "Detroit.

Q. "Where were you arrested first?

A. "In Detroit.

Q. "That is where you were arrested?

A. "Yes, sir.

Q. "Were you arrested in Chicago May 7, 1922?

A. "They arrested me for gambling.

Q. "How long did you serve in the Jackson, Michigan, penitentiary for robbery?

A. "Two years."

Proper objections were made to all these questions and the objections were curtly overruled.

During the cross-examination of William Maneates, another witness for the defense, the following occurred:

Q. "You have had a little trouble, have you, some time or other?

A. "With whom?

Q. "With a shoulder, a little?

A. "Where?

Q. "Shot through the shoulder?

Nash: "Object to that as improper; not proper cross-examination.

Smith: "All right.

Nash: "What is the court's ruling?

The court: "I don't know what he is alluding to, I am sure.

Smith: "I will withdraw it, if you don't want—

Nash: "I object to withdrawing it—

Smith: "If you don't want it answered I will withdraw it to save time.

Nash: "Object to him asking a question of that kind in the presence of the jury as being designedly for the purpose of prejudicing and arousing the prejudices of the jury, and I ask the court to admonish him against any repetition of these improper actions.

Smith: "It's not so—

The court: "If there is any reason to go on with that cross-examination you can—

Nash: "Well, I will ask the court—

The court: "Or if not, you shouldn't have started it; you should go on and show it; the bullet wound is there, if he has any.

Smith [to witness]: "I will ask you, you are in the bootlegging business now, are you? [Objection overruled.]

A. "I am cooking, only.

Q. "Don't you sell wine over on Polk street? [Objection overruled.]

A. "I can buy a gallon for somebody else and I sell it; I don't sell no wine; I drink all myself."

Michael Maharas, a witness for the defense, testified that Lardas told him that he and Visvardis and Charahus had tried to kill Garines and Barbas and that instead of killing them Visvardis and Charahus were killed. On cross-examination the following occurred:

Q. "Did you ever go bonds for anybody charged with murder?

A. "No, sir; not me.

Smith: "I am trying to get into your record.

Witness: "Yes, sir.

Q. "Do you know a man named Judge Williams?

A. "I do not.

Q. "Was there any trouble in your place when Judge Williams was beat up in your place at Seventy-ninth and Halsted?

A. "No, sir.

Q. "About a year or a year and a half ago, wasn't there a man beaten up in your place at Seventy-ninth and Halsted?

A. "No, sir.

Q. "Was there an arrest at the place?

A. "No, sir.

Q. "Sure it wasn't at your place?

A. "I am positively sure.

Q. "You are the only Greek candy man on the corner of Seventy-ninth and Halsted?

A. "There is another one; there are two more.

Q. "You are the only Greek candy man on the corner?

A. "There is another one on the corner.

Q. "A year and a half ago?

A. "Yes, he was.

Q. "I am talking about the northeast corner.

A. "Yes, I am on the northeast corner; that never happened in my place as I know, and I am there six years."

Thereafter the prosecutor called Charles A. Williams, a former judge of the circuit court of Cook county, and after locating the cigar store at the corner of Seventy-ninth and Halsted streets, in Chicago, the following examination took place:

Smith: "Did you ever have any difficulty in that store?

Nash: "Just a minute, Judge. I object to that, your Honor, on the ground that it is not proper rebuttal, and it is improper, irrelevant and immaterial, and is, if it is anything, only additional proof of something I believe improperly admitted.

Smith: "If the witness Maharas will lie about immaterial matters he will lie about material matters.

Nash: "Object to the statement of the State's attorney and move to strike it out.

The court: "I will strike it out and overrule the objection.

Nash: "Also object on the further ground, your Honor, that this question was asked in connection with the impeachment of Maharas, and the witness has not stated that he knows Maharas.

Smith: "Maharas says there was never an altercation in his place,—there never was any trouble in there and Judge Williams never was beaten in there.

Smith: "Judge Williams, were you beaten up and attacked in the place on the northeast corner of Seventy-ninth and Halsted?

Witness: "I had a fight in that store once.

Smith: "Who did you have a talk with?

Witness: "The man who owns the store.

Smith: "Were they employees?

Witness: "I don't know; they were back of the counter.

Smith: "Was there a court proceeding after that?

Witness: "There was.

Smith: "What was the result of that court proceeding? The defendants were in court, were they, at that time?

Witness: "Men were in court; I don't remember who they were.

Smith: "And I will ask as to the location of the four corners of Seventy-ninth and Halsted streets.

Witness: "It is the northeast corner.

Smith: "Judge Williams, will you tell me what the fight was about and how it started?"

Proper objections were made to all of the cross-examination of Maharas with respect to the altercation with Judge Williams and to all of the examination of Judge Williams on this subject, but all these objections were overruled. On cross-examination Judge Williams testified that he did not know the witness Michael Maharas and that he did not know who the two men were who were in the place when he had his fight there, two or three years before.

During the direct examination of the defendant Vithoulkas the following occurred:

Nash: "After you talked to this man were you called to any place,—to the State's attorney's office?

A. "Yes, they let me tell the story.

Smith: "Answer your lawyer's question.

Witness: "How is that thing coming,—his brother come there to see me.

Smith: "I want to object to the witness' volunteering anything,—any statement. I object to him answering counsel's question, and I think he ought to be reprimanded for it.

The court: "This is one of the defendants and I give him more latitude than an ordinary witness.

Smith: "It is just a lot of cooked-up stuff here.

Nash: "I object to that remark as highly improper and prejudicial. The counsel said it is a 'lot of cooked-up stuff.' I want to object to counsel's statement before the jury, and ask that the jury be instructed to disregard it and that counsel be admonished.

The court: "It would be a question of argument, wouldn't it?

Nash: "It is, sometimes, but counsel ought to be admonished, in view of the repeated offenses in this line.

Smith: "This man bursts out with speech every time Mr. Nash asks him a question; Mr. Nash can hold him down, if he wants to.

The court: "We all know what it is; we are not blind; go on, Mr. Nash."

This remark of the court was highly prejudicial. The court undoubtedly meant to insinuate that the defendant's testimony was "a lot of cooked-up stuff" and that his attorney could control his testimony if he desired. This impression is the only one that the jury could have received, under the circumstances.

Whatever explanation the trial officers have to make of their conduct, the fact is that the plaintiffs in error have not had a fair trial. Although there may be enough evi-

dence in a record to justify a conviction, a defendant has a right to a trial by jury and not by this court. He has a right to be tried in accordance with the law of the land, and a conviction secured in total disregard of that law can not be sustained. (*People* v. *Gardiner*, 303 Ill. 204.) The law does not provide one method for trying innocent persons and another for trying guilty persons. (*People* v. *Newman*, 261 Ill. 11.) Respect for the law and its proper administration will not be established by lawless and unprofessional conduct of those charged with the enforcement of the law. We have quoted enough of the testimony of the witnesses improperly impeached to show that their testimony was material to the defense. For the misconduct of the State's attorney in the examination of witnesses for the defense and the errors of the trial court in permitting such misconduct this case must be reversed. *People* v. *Decker*, 310 Ill. 234; *People* v. *Green*, 292 id. 351; *People* v. *Simmons*, 274 id. 528.

On behalf of the People the court gave to the jury the following instruction:

"The court instructs the jury in the language of the statute that if a person kills another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life or to prevent him from receiving great bodily harm, the killing of the other was absolutely necessary and it must appear also that the person killed was the assailant, or that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given."

This instruction is simply a copy of section 149 of the Criminal Code, and is another labor-saving makeshift commonly used in homicide trials but which does not give the jury any accurate knowledge of the law of self-defense. This instruction has been repeatedly condemned. (*People* v. *Durand*, 307 Ill. 611; *Kipley* v. *People*, 215 id. 358;

*Steiner* v. *People,* 187 id. 244; *Enright* v. *People,* 155 id. 32; *Gainey* v. *People,* 97 id. 270; *Campbell* v. *People,* 16 id. 17.) The law on this subject was announced in the *Campbell case* in 1854, and the doctrine announced in that case has been approved in every case since that time in which the question has arisen. There is no plausible excuse for the State's attorney offering or the court giving an instruction so long and so often condemned.

The judgment of the criminal court is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

---

(No. 16347.—Judgment affirmed.)
THE CITY OF HARVARD, Appellant, *vs.* M. D. ROACH *et al.* Appellees.

*Opinion filed December 16, 1924.*