THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JACOB GOLDMAN, Plaintiff in Error.

*Opinion filed June 18, 1925—Rehearing denied October 8, 1925.*

1. CRIMINAL LAW—*provision of the Criminal Code making a fiduciary guilty of larceny who fails to account applies to receivers.* The provision of section 81½ of Criminal Code that any administrator, executor, guardian, conservator, trustee, "or other person acting in any fiduciary capacity," who fails to pay over or account for money or property when legally required to do so, shall be deemed guilty of larceny, applies to receivers, as they are, in the main, of the same general character as the officers mentioned and may be included under the rule of *ejusdem generis.*

2. SAME—*when evidence is sufficient to convict if it supports either count.* Where an indictment in one count charges larceny as bailee and in another charges larceny by embezzlement and both refer to the same transaction, judgment and sentence may be entered on a general verdict of guilty in manner and form as charged if the evidence supports either count.

3. SAME—*what evidence of other offenses is admissible in a prosecution for embezzlement and larceny.* In a prosecution of a receiver for embezzlement and larceny in regard to the accounts of a particular partnership estate, it is not error to admit evidence of accounts in other receivership cases which the defendant handled at the same time, where the assets are intermingled in one account and the evidence is for the purpose of determining whether the defendant had sufficient funds to enable him to account.

4. SAME—*when, only, may conviction be reversed as not supported by evidence.* Only when a reviewing court can say, from a consideration of all the testimony, that there is a reasonable and well-founded doubt of the guilt of the accused is it warranted in reversing a judgment on the ground that it is not supported by the evidence.

THOMPSON, HEARD and DEYOUNG, JJ., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HOSEA W. WELLS, Judge, presiding.

LLOYD D. HETH, for plaintiff in error.

EDWARD J. BRUNDAGE and OSCAR E. CARLSTROM, Attorneys General, ROBERT E. CROWE, State's Attorney, ALBERT D. RODENBERG, EDWARD C. FITCH, and VIRGIL L. BLANDING, (EDWARD E. WILSON, CLARENCE E. NELSON, and HENRY T. CHACE, JR., of counsel,) for the People.

Per CURIAM: At the July term, 1923, of the criminal court of Cook county the grand jury returned an indictment against plaintiff in error, Jacob Goldman, charging him in three counts with larceny as bailee, embezzlement, and larceny. A motion to quash the indictment was overruled. At the conclusion of the evidence the State's attorney *nollied* the third count and asked for a conviction under the first count for the wrongful conversion of a $50 Victory bond. At the conclusion of the trial the jury returned a verdict finding plaintiff in error guilty as charged and fixing the value of the property converted at $550. Motions for a . new trial and in arrest of judgment were overruled and plaintiff in error was sentenced to the penitentiary.

This prosecution arises out of the conduct of plaintiff in error (hereafter called defendant) as receiver of the estate of a partnership, Kirby, Cullen, Auer & Honecker, in a proceeding in the circuit court of Cook county to wind up its business. Defendant was appointed receiver of this estate September 23, 1920, and continued in that capacity until he was removed, May 14, 1923. At the time of his removal he was acting as receiver in 298 cases pending in the courts of Cook county. Between the time of his appointment and that of his removal several orders were entered directing him to collect the assets of the estate, to pay certain claims against the estate and distribute the balance

among the four persons constituting the partnership. The proof in the record shows Goldman received and receipted for property of the partnership, two $500 Hamilton Club bonds, ten $100 Victory bonds, one $500 note, one share Refrigerator Car Equipment Company stock, two plate-glass insurance policies, and one lease to room 1304 Standard Trust building.

The first count of the indictment charged defendant with larceny as bailee of $9521 in money, one $500 bond and one $50 bond, the property of the partnership named. The second count described the same property and alleged defendant was appointed receiver of Kirby, Cullen, Auer & Honecker, co-partners, and came into possession of assets of the partnership; that he was legally required by the court to account for said funds and property and pay and turn them over to the Chicago Title and Trust Company, his successor as receiver, but refused to do so, whereby he committed larceny.

The first contention of defendant which we will notice is that a receiver is not subject to indictment under section 81½ of the Criminal Code. That section is as follows: "Whoever, being the administrator of the estate of a decedent, or the executor of a last will, or guardian of any minor, conservator of any idiot, distracted person, drunkard, spendthrift or insane person, or trustee or other person acting in any fiduciary capacity, without good cause, fails or refuses, when legally required by the proper person or authority, to account for or pay over to such person or persons as may be lawfully entitled to receive the same, any money, choses in action, or other property which may have come into his hands, by virtue of his office, duty or trust, shall be deemed guilty of larceny."

It will be seen the statute specifically enumerates as liable to indictment and punishment for larceny, any administrator, executor, guardian, conservator, trustee, "or other per-

son acting in any fiduciary capacity." A receiver is not specifically mentioned, and it is argued a receiver is not a trustee and does not act in a fiduciary capacity, and the statute should not be construed to embrace that office. Counsel on both sides say there is very little direct authority to be found on the question. In addition to the general principle that a receiver is an officer of the court, that property in his possession is *in custodia legis,* that he stands indifferent between the parties having claims against the funds but his duty is to preserve the property and disburse it upon orders of the court, counsel for defendant relies on a decision of the Supreme Court of Kansas in *State* v. *Hubbard,* 58 Kan. 797. We do not consider that case decided the question here raised. The court construed a statute making persons occupying certain positions liable for embezzlement and larceny. The statute mentioned trustees and agents but not receivers. A receiver was indicted and convicted, and the conviction was sought to be sustained on the ground that he came under the designation of "agent." The court held a receiver was not an agent and reversed the judgment of conviction. It is apparent some meaning must be given "or other person acting in any fiduciary capacity," in section 81½.

Counsel for the State argue that a guardian or conservator has no title to the property but possession only by virtue of his appointment by the court, and a receiver is of the same character of fiduciary and under the rule of *ejusdem generis* is embraced in the statute. In *People* v. *Caminetti,* 242 U. S. 470, the defendant was indicted and convicted under a statute which forbade transporting a female from one State to another for the purpose of prostitution or debauching or for any other immoral purpose. It was contended on behalf of the defendant that the statute was intended only to apply to commercialized vice, and that as what defendant did was free from any element of commercialism his act was not within the statute, no matter how immoral

it may have been. The court held, in effect, that construction would nullify a part of the statute; that it might be more culpable and baser in morals to transport a woman to another State for prostitution for pecuniary gain, but the transportation for the purpose of enjoying sexual relations is an immoral purpose and the statute covered such acts.

The enactment of section 81½ was intended to apply to officers or persons entrusted with the management or the preservation of the property of others. We think of no reason why a receiver should be exempt from its provisions. He is appointed by the court to preserve and account for the property the same as a guardian or conservator. The legislature intended the statute should apply to others than those specifically designated. It is true that body might have mentioned receivers if it was intended the act should apply to them, but the fact that it did not is not conclusive the act was not intended to embrace receivers. Having mentioned similar positions as subject to the act which are generally regarded as fiduciary capacities, the statute, without further enumeration, was made to apply to other persons acting in a fiduciary capacity. Perhaps a receiver is, strictly speaking, not a fiduciary nor a trustee, but it is not uncommon to refer to a receiver as a *quasi* trustee or a fiduciary. (*King* v. *Goodwin*, 130 Ill. 102; 23 R. C. L. sec. 2, p. 8; *Ardmore Nat. Bank* v. *Briggs Co.* 20 Okla. 427; 4 Pomeroy's Eq. Jur. sec. 1336, p. 2663.) Paraphrasing the language of the Supreme Court of the United States in the *Caminetti case, supra,* the added words, "or other person acting in any fiduciary capacity," show beyond question the legislature had in view the protection of society against other persons than those specifically enumerated. As receivers are, in the main, of the same general character as those mentioned, under the rule of *ejusdem generis* the act was intended to and does apply to them.

Both counts describe the same property. The only difference is, the first count charges larceny as bailee, and the

second charges larceny by embezzlement. The jury returned a general verdict of guilty in manner and form as charged in the indictment. The same transaction is charged in both counts. If the evidence supported either, it was not error to render judgment and sentence on the verdict. *Duffin* v. *People,* 107 Ill. 113; *Langford* v. *People,* 134 id. 444; *Love* v. *People,* 160 id. 501.

Arthur J. Belfry testified as a witness for the State. He is a public accountant and was employed by a surety company to audit the accounts of defendant as receiver. He made an abstract from the original books. He got the files at the Chicago Title and Trust Company. He examined check books, stubs, canceled checks, books and court files. He began the work in May, 1923, and completed it in January, 1924. The witness audited the accounts of defendant in all the 298 estates of which he was receiver. He found defendant was accountable to all the estates in an aggregate of $205,000. Defendant had on hand approximately $40,000. He found the defendant was accountable to the Kirby-Cullen estate for $4441.56. Some of the files and papers he found at the Chicago Title and Trust Company and examined them there. He secured the records impounded by Judge Scanlan and examined them, and from all books, papers and files examined he made an abstract showing the amount the defendant was accountable for to each estate. In some instances he found canceled checks which had not been entered in the books. If a canceled check had no name of an estate on it and there was nothing to show on account of what estate it had been drawn the witness put it aside and did not post it. He gave the defendant credit for disbursements shown by the ledger whether he found canceled checks or not. The total receipts in the Kirby-Cullen estate were $23,170.59, disbursements $18,654.03. Witness charged defendant with the receipts he found in his ledger and gave credit for disbursements on the ledger. He had no record of a payment by check

No. 6055 of $1000 to Lurie & Fishel. He testified his abstract shows Honecker, one of the partners, had received $2012.51, and Auer, another partner, $4726.39, and that if either or both received more his audit was not correct. At the time witness took the figures for his audit there were a lot of loose sheets floating around the office of the Chicago Title and Trust Company. They were loose and in practically everybody's hands. Whoever wanted to work on them took them. Some one assembled them, but witness did not know whether they all got back in the ledger or not. They were loose probably a month. Witness used them while they were loose. He worked on them about eight months. He said his figures were correct. Some of the 298 estates defendant owed nothing. In some estates he had paid more than he received. Witness gave him no credit for what he had overpaid in those estates. He did not give defendant credit for paying the Chicago Title and Trust Company $75,000. Included in that were a lot of moneys returned from attorneys which had already been credited. He gave the defendant credit for receiver's fees whenever there was a court order for fees. He ignored the payment of attorney's fees because he did not find the canceled checks. Counsel for defendant, on cross-examination, asked Belfry if he gave defendant credit for $75,000 paid the Chicago Title and Trust Company, and witness answered he did not; that there were included in the $75,000 a lot of funds returned from attorneys which had already been credited.

Chester R. Davis, assistant trust officer of the Chicago Title and Trust Company, testified the trust company received a large amount of money from defendant. One check was signed by defendant as receiver and one by him individually. He could not give the amount without looking at the records. As he remembered, it was money of all the receivership cases. The record does not show the

amount the Chicago Title and Trust Company received from defendant, and we are unable to guess the amount.

The testimony referred to is the only reference we find in the record to any payment made by defendant to the Chicago Title and Trust Company. As no receipts or canceled checks were offered in evidence to show the amount and it cannot be determined what amount was paid, apparently counsel relies upon his cross-examination of Belfry to prove the amount was $75,000, but obviously that does not prove it. It would have been a simple matter to have made definite proof of the amount and not have left it to uncertainty.

Michael Feinberg, a lawyer, testified he was present at the hearings in court during April and May, 1923. Defendant stated he had at that time a balance in the North Shore Trust and Savings Bank and the Keystone Bank of about $22,000, in the National Bank of Commerce either $21,000 or $22,000, a balance of about $100 in the Central Trust Company, $200 in a New York bank, and except a Cadillac car, a diamond ring and wearing apparel that was all the property he had in the world. He said the money he had in banks was borrowed from various people.

Miss Cecil H. Page testified at great length. She had been employed by defendant as stenographer and secretary until his removal as receiver. Thereafter she was employed by Judge Scanlan. Defendant asked her to make up a statement for Harry J. Lurie, who was one of the attorneys for Cullen. Witness had one of the girls type Exhibit 14 from the books, and defendant took it to Lurie before it was checked up. Exhibit 14 showed receipts in the Kirby-Cullen estate of $23,904.44 and disbursements $28,850.43. Among the disbursements was an item to Auer, one of the partners, of $12,263.39. That credit was incorrect and was so admitted by defendant. It should have been $1226.39.

Harry J. Lurie testified he was attorney for the Kirby-Cullen partnership and called up defendant by telephone and

requested a statement of receipts and disbursements. Defendant said he would have his young lady make it up and send it to Lurie. Some time afterwards he found the statement on his desk. He called defendant up and told him of the item of $12,263.39 credited as paid to Auer. Defendant said it was a typographical error made by the girl; that he had not paid Auer that amount. The correct sum paid Auer was $1226.39.

Miss Page for the State testified the greater part of the writing in defendant's ledger was done by defendant's former secretary. Some of it was by the witness. The ledger was a loose-leaf book of 600 pages, and contained receipts and disbursements in the various cases in which defendant was receiver. She began work for defendant in June, 1921, and knew nothing about the entries before that time. The books had not been posted to date when she began work. She posted from the check book and from what defendant told her. At the time she quit working for defendant, April 26, 1923, she was a month behind in posting books. The check stubs showed a number of checks not posted, and that was true in a number of the estates. After the Chicago Title and Trust Company took possession she did not work on the books. The books and papers were removed from defendant's office by four men May 15, 1923. She testified she told Judge Scanlan the Chicago Title and Trust Company was making an effort to prevent defendant from making a full and true report, because he was not permitted access to the books and papers. All the posting in the Kirby-Cullen estate was complete, so far as witness knew, when the books were taken possession of by the court. Defendant would not allow witness to get the canceled checks; that he would get them when he wanted them. He made disbursements from a check book which he carried in his pocket and often took blank checks out of the check book kept in the office. At one time defendant told witness to "slice" the books,—to cut out items of receipts. She would

take out a page and put a new one in place of it. Disbursements were made to lawyers by checks, which defendant did not permit to go on the books. There were some records burned by defendant at the beginning of the investigation. Defendant told witness he would not have employed her if she had been a good book-keeper. Defendant said in his office to Dahl, one of the lawyers he had paid fees not credited on the books, he would need somewhere in the neighborhood of $100,000. All the receipts in the Kirby-Cullen estate which witness knew anything about were in the books. She did not know whether all money paid out was in the books.

Honecker, one of the partners in the Kirby-Cullen partnership, testified he was paid $500 more by defendant than was shown by Belfry's audit. Auer, another partner, was paid $500 more than was shown by the audit made by Belfry. Defendant also paid to Lurie & Fishel, attorneys, $1000 by check No. 6055, which defendant was not given credit for in the audit.

We have endeavored to refer to enough of the testimony to show that defendant kept his books and accounts in such an incorrect and confused manner that neither he nor an expert accountant could make an accurate statement of them. The books, papers and files from which the audit was made had been taken to different places, where they were examined or secured by the auditor for examination. In one instance defendant was charged on his books with a large amount more than he received. The audit showed defendant was accountable in the 298 receivership estates for approximately $200,000. There is evidence that he said he was accountable for $100,000. He had on deposit approximately $40,000, which the proof shows he said, together with a Cadillac car, a diamond ring and wearing apparel, was all the property he owned. He also admitted the money he had on deposit, or most of it, was borrowed. He maintained an account with the National Produce Bank,

in which Miss Page testified he kept the funds of all, or substantially all, the receiverships. The condition of defendant's books, his instructions to his secretary as to what she should and what she should not do in keeping the books and accounts, create the irresistible conclusion that there must have been a purpose and intent in defendant's mind to use the funds and so confuse his accounts that it would be difficult to determine with accuracy how much he was accountable for in any particular estate. The court permitted testimony of the audit of the accounts in all of the receiverships and of the amount he was accountable for in each of them in which he had not disbursed all the receipts as shown by the books. In several of them the audit showed no balance due from defendant, but in many of them balances due were shown, aggregating, as we have said, $205,000. In the Kirby-Cullen estate the audit showed defendant accountable for $4441.56. That is incorrect, as the proof showed disbursements of $2000 which defendant was not credited with by the auditor. That would reduce the amount defendant was accountable for in that estate to $2441.56.

Defendant insists the court erred in permitting proof of the state of the accounts in all the receivership cases and contends the testimony should have been limited to the Kirby-Cullen estate. The indictment charged money and property embezzled and stolen was the property of the Kirby-Cullen partnership. It is well understood that proof of the commission of other crimes in no way connected with the one charged in the indictment is not competent, because it does not tend to prove guilt of the defendant of the crime charged. The court, in admitting the evidence, said that the assets were intermingled in one account, and he admitted the evidence for the purpose of determining whether defendant had sufficient funds to enable him to account. Under the peculiar circumstances of this case we are of opinion the court did not err in admitting the evidence. The de-

fendant proved he had in banks, as assets of his receiverships, $40,000. The evidence showed he was accountable for a much larger amount. If, then, the evidence showed he was accountable to the Kirby-Cullen estate for $2000 and nothing was shown as to his liability to any of the other estates in which he was acting as receiver, proof of assets of $40,000 would show he had much more than enough to settle his account with the estate. If the proof shows the defendant accountable to a great many estates, amounting in the aggregate to $200,000, but that in no one of the estates is he accountable for more than $5000, if he were called upon to account and pay over in all of them, as he was, he could not do so with a $40,000 bank deposit. If the testimony had been entirely limited to defendant's account in the Kirby-Cullen estate and showed receipts of $2000 more than disbursements the balance would be less than the assets in the bank, but if called to account, as defendant was, in all of them, the assets in the bank would be wholly insufficient. If he were called to account in each one of the cases he could not do so by exhibiting the same cashier's check or bank deposit in each case when the aggregate amount he was liable for was five times more than the cashier's check or bank deposit. Defendant was not found guilty of larceny of the assets of anyone except the Kirby-Cullen partnership. It would have been difficult, if not impossible, to prove that charge without proving the state of defendant's account in the other cases, and it does not appear to us defendant's rights were prejudiced by the testimony.

We cannot certainly know what items made up the $550 which the jury found was not accounted for by defendant. His counsel argues the $50 Victory bond could not have been part of it because the proof fails to show defendant received it as part of the Kirby-Cullen assets. It was not included in the assets receipted for by defendant. The proof on that question was in substance as follows:

Jacob Auer, a member of the Kirby-Cullen partnership, testified they received from a debtor, shortly before the defendant was appointed receiver, a $50 Victory bond No. H-8423235, and witness made an entry of its receipt on the partnership books. State's Exhibit 9 contains the list of property of the partnership receipted for by defendant when appointed receiver. It does not mention the $50 bond.

William H. Cullen, one of the former partners, testified they owned a $50 Victory bond No. H-8423235, but he did not remember whether it was turned over to defendant.

Charles A. Koepke, president of the Keystone Bank, testified that April 9, 1923, defendant gave his note for $1800 for money borrowed from the bank and put up as collateral the bond No. H-8423235, together with other securities. The note was paid by the sale of the collateral. The witness testified that he remembered a conversation with defendant after the bond was sold, in which he said he wanted to take up the $50 bond but had been thrown in jail before he could do so, and when he got out the bond had been sold.

A court reporter who took the testimony of defendant in an examination of him in Judge Scanlan's court in an investigation of the receivership before the indictment was returned, testified defendant stated he remembered having in his possession a Victory bond and that he put it up as collateral with the Keystone Bank. He did not know where it came from. He was asked if he received it from the Kirby-Cullen estate, and replied, "I don't think that is a Kirby-Cullen bond." He was told the Kirby-Cullen records show a Victory bond of the same number as the bond put up as collateral with the Keystone Bank, and replied, "That was the one that was mislaid." He admitted he put the bond, together with others, up with the bank to secure a loan to him.

Joseph Schwartz, a member of the firm of Allen, Ward, Meyer & Schwartz, lawyers, testified he loaned defendant $500 April 18, 1923, and took his note for that amount.

When defendant first asked for the loan witness told him
he would take it up with Ward, as Allen was in Europe.
In the afternoon of the same day defendant went to wit-
ness' office and said he had to have the money that day;
that Allen had said he could have it before he left.   Defend-
ant took a $500 bond out of his pocket and said witness
could hold the bond until he talked with Ward, and if it
was all right with him witness could return the bond.  The
$500 note was then signed and witness gave defendant a
check for that amount.  He turned the bond over to a girl
in the office and it was filed away.  He never saw it after-
wards.  It was the only Hamilton Club bond, so far as wit-
ness knew, in their office.

Ernest H. Allen came back from Europe about May 20.
The note had not been paid.  Allen testified that after his
return he had a talk with defendant about a Hamilton Club
bond.  He met defendant in Judge Scanlan's court and the
bond was mentioned.  Witness got it from his office and
turned it over to the Chicago Title and Trust Company.
He had no other Hamilton Club bond.

Ann Healion, a court reporter, testified she took the tes-
timony of defendant at the time he was being investigated
in Judge Scanlan's court in May, 1923.  She testified he
then stated the two Hamilton Club bonds belonged to the
Kirby-Cullen estate and came into his possession as re-
ceiver; that the Chicago Title and Trust Company had one
of them and the other one he lost; that Allen, Ward, Meyer
& Schwartz got a $500 bond and the money was deposited
in the receiver's account.  He said he got a loan upon it
for the receivership.  He supposed Allen, Ward, Meyer &
Schwartz had the bond.  He put the money borrowed in
the bank.

Chester R. Davis, assistant trust officer of the Chicago
Title and Trust Company, testified that company received
a Hamilton Club bond from Allen and they got another
Hamilton Club bond from defendant's office when they took

possession of his effects; that the company now has two $500 Hamilton Club bonds. Davis testified it took some time to sort and remove papers and files. Defendant was present the greater part of one day. Some of the files were on the floor, some on tables, some in the wall-safe cabinet, some in the filing cabinet and some in various other places. Everything was in a chaotic condition. They took two van-loads of documents and papers and were about four days at it. After defendant was in jail witness took some records from his office. He was acting under orders of the court. Nothing of value was received from defendant's office except a $500 Hamilton Club bond.

The assets of the Kirby-Cullen partnership receipted for by defendant, in addition to the two $500 Hamilton Club bonds, included ten $100 bonds, a note for $500 and one share of stock. It was not shown what disposition had been made of them or what amount was realized from the assets. Nothing can be traced from the testimony unless it be the $50 bond and the two Hamilton Club bonds.

· The proof abundantly warranted the conclusion that defendant made no honest attempt to conserve the assets which came to his hands as receiver. He admitted in the investigation made of his conduct as receiver that he was financially embarrassed; that all the money he had on deposit in banks was borrowed money. He did not testify on the trial, and no proof whatever was offered to explain why, as receiver, he was compelled to borrow money to meet his obligations.

Some complaint is made of giving and refusing instructions, but in our view of the law no reversible error was committed in that regard.

This case is complex and we have not attempted to refer to all the testimony. We have endeavored to fairly refer to the substance of the most important evidence, and upon consideration of the whole record we are of opinion defendant had a fair trial, that no prejudicial error inter-

vened, and that whether his guilt was proved beyond reasonable doubt was a question for the jury. Only when a reviewing court can say, from a consideration of all the testimony, there is a reasonable and well founded doubt of the guilt of the accused is it warranted in reversing a judgment on the ground it is not supported by the evidence. *Gainey* v. *People,* 97 Ill. 270; *Steffy* v. *People,* 130 id. 98; *McCoy* v. *People,* 175 id. 224; *Lathrop* v. *People,* 197 id. 169.

We are unable to say the verdict and judgment are not sustained by the evidence, and the judgment is affirmed.

*Judgment affirmed.*

Mr. JUSTICE THOMPSON, dissenting:

It is important that the guilty be punished but it is far more important that barriers erected by the law and designed for the protection of the innocent should not be broken down by this court even for the purpose of affirming the conviction of a person who appears to be guilty. While the conduct of Goldman does not comport with innocence, this court should not, upon the consideration of incompetent evidence, conclude that he is guilty and then hold that the errors committed by admitting the incompetent evidence do not justify a reversal. This is a court of review and not a court of first instance. The question for us to determine is not whether Goldman is guilty of wrongdoing but whether he has been tried according to law. The constitution guarantees that a man accused of crime shall be entitled to a trial by a jury, and this means a trial on competent and relevant evidence. The law does not provide one method for trying innocent persons and another for trying guilty persons. (*People* v. *Garines,* 314 Ill. 413; *People* v. *Newman,* 261 id. 11.) The question before us is not what we may think of the guilt of Goldman, but what would the jury have done if the case had been submitted to it without the admission of the immaterial and

incompetent evidence. The rule that a judgment will not be reversed where the evidence establishes the defendant's guilt does not justify a total disregard of the rights of the accused. If in every case where a crime has been committed and where the evidence strongly indicates the guilt of the accused we disregard the salutary rules adopted to prevent the conviction of innocent persons in order to affirm the conviction, our decisions will depend not upon the question whether prejudicial error has intervened and whether the prisoner has enjoyed the fair and impartial trial guaranteed by the law, but upon our own conclusions with reference to the sufficiency of the evidence to show guilt.

By the first count of the indictment as it stood after the election of the State's attorney at the conclusion of the evidence, plaintiff in error was charged with converting to his own use, with intent to steal the same, a $50 Victory bond received by him as bailee from the partnership named. Inasmuch as there is no evidence in the record showing that plaintiff in error received from the partnership in any capacity a $50 Victory bond, it is clear that the verdict cannot rest upon this count. The only evidence concerning a $50 Victory bond is, that about a month before the dissolution of the partnership one of the partners received such a bond from one of its clients in payment of an account, and that the same bond, nearly three years later, was pledged by Goldman, together with other bonds, to secure a loan from a Chicago bank. No person testifies when or how or under what circumstances this bond came into Goldman's hands. Furthermore, the amount named in the verdict indicates that the finding of guilty was returned under the charge contained in the second count of the indictment.

The second count of the indictment charges that there came into the possession of Goldman, as receiver, $9521 in cash, one $500 bond, one $100 bond and one $50 bond, of the property of W. C. Kirby, W. H. Cullen, Jacob Auer and Charles A. Honecker, co-partners; that he failed to

comply with an order of the circuit court entered May 14, 1923, directing him to account for said funds and turn the same over to the Chicago Title and Trust Company, appointed in his stead as receiver of the partnership estate, by reason of which he is guilty of stealing the funds of said co-partners, Kirby, Cullen, Auer and Honecker.

To support the second count of the indictment the State produced the following evidence: A statement of the account of the estate of Kirby, Cullen, Auer & Honecker showing receipts amounting to $23,904.44 and disbursements amounting to $28,850.43, furnished by the employees in Goldman's office to the attorney for W. C. Kirby; a statement by an auditor who audited the accounts in the 298 estates of which Goldman was receiver, showing the amount in each estate for which Goldman was accountable, showing the amount due in the Kirby, Cullen, Auer & Honecker estate to be $4441.56, and showing the total amount for which Goldman was accountable in all of the 298 estates to be $205,372.30; proof of admissions made by Goldman in a citation proceeding before the circuit court regarding his acts and doings as receiver in all these estates, to the effect that he had on deposit in the banks of Chicago approximately $40,000; proof of an admission by Goldman in the citation proceeding that he had pledged one of the $500 Hamilton Club bonds with a law firm in Chicago as security for a loan of $500; proof that he had purposely employed an incompetent book-keeper, and that he had instructed her to alter certain accounts in the books so that the books would not show certain disbursements made by him in estates other than the Kirby, Cullen, Auer & Honecker estate; a loose-leaf ledger which purported to show Goldman's active receivership accounts; proof that Goldman had employed certain of the county employees in the court house to use their influence to secure his appointment as receiver; proof that Goldman had borrowed various sums of money with which to make bank deposits when called

upon by the circuit court to make a showing with respect
to his acts and doings as receiver in the several estates;
proof of an admission by Goldman in the citation proceed-
ings that he was in financial difficulty; and proof of an ad-
mission made at his office that he needed $100,000 to square
his receivership accounts.

It was shown on cross-examination that the statement
furnished to Kirby's attorney was incorrect. It showed dis-
bursement to Jacob Auer of $12,263.39, whereas the amount
paid to Auer was $1226.39. It failed to show a disburse-
ment to Kirby's attorney of $1000. There is no proof in
the record that Goldman personally examined this report
after it was made up or that he had any knowledge of its
contents. The statement was received in evidence but was
not read to the jury. Notwithstanding this, it was taken
by the jury when they retired to consider their verdict.

The auditor's statement was based upon an audit made
by him of books and papers scattered about the city of
Chicago by persons acting under orders issued by the judge
of the circuit court to whom had been assigned the cases
pending in which Goldman had been appointed receiver.
The court entered an order removing Goldman as receiver
and appointing in his stead the Chicago Title and Trust Com-
pany and directing Goldman to deliver to his successor all
property of every kind and description that he held as re-
ceiver, and all books, records and papers of every kind and
character in his possession and control as such receiver, and
that he within ten days file with the clerk of the court a
full and complete account, under oath, of his acts and do-
ings and receipts and disbursements while acting as receiver,
together with all vouchers showing disbursements. Ac-
cording to the proof in this record, which is undisputed,
the court summoned Goldman's secretary before it, exam-
ined her at length, and told her at the conclusion that she
was to take charge of all of Goldman's books and docu-
ments, that she was no longer in Goldman's employ but was

an employee of the court, that she was to forbid Goldman access to any of his papers or books, that she should change the lock of Goldman's office, have duplicate keys made for the new lock, and that she was to keep one key and deliver the other to him.   She brought to the court from Goldman's office some check stubs, a journal and a ledger.   The day following the entry of the order removing Goldman as receiver his offices were raided and four men removed from his office all records, documents, papers and books pertaining to all of the estates of which Goldman had been appointed receiver by the circuit court.   These men spent several days selecting the property they wanted.   There were two van-loads of documents and papers removed from Goldman's office to the Chicago Title and Trust Company building.   During a part of the time that Goldman's offices were being ransacked he was in jail.   Why, when or by whom he was put in jail does not appear from the record.   When the auditor examined the books from which he made his report he found some of them in the trial judge's chambers, some in the jury room connected therewith, some in the office of the secretary to the chief justice of the circuit court, and the greater portion of them at the offices of the Chicago Title and Trust Company.   At the last mentioned place he found a loose-leaf ledger.   This had been taken apart and its leaves were floating around the offices of the trust company and were being used by at least four different employees.   The auditor carried some of these papers from one building to another and took some of them to his own office.   None of the papers and books were identified as Goldman's.   No witness testified that the books used by the auditor were the books taken from Goldman's office or that they were in the same condition as those taken from Goldman's office.   There is no proof that Goldman knew the contents of any of these books, or that they were made in the regular course of his business as receiver, or that any of them were books of original en-

try. Goldman's book-keeper testified that when the raid was made she was at least a month behind in the posting of his books, but that she had memoranda in the office from which she expected to make her entries; that the first entry made by her in the Kirby, Cullen, Auer & Honecker account was June 20, 1921, and that she knew nothing about who made the entries prior to that time and did not know whether they were true; that at the time she began to work for Goldman his books were not up to date and that she posted them from the check book stubs; that as far as she knew, all receipts in the Kirby, Cullen, Auer & Honecker estate were shown on the books at the time of the raid but that there were a number of disbursements which did not appear on the books. The auditor testified that he gave Goldman credit for checks showing disbursements only when the estate in which the disbursement was made was noted on the check, but if the check was not so identified no credit was given; that there were many unidentified checks found among the papers being audited by him but that he did not total them; that the books showed that the disbursements in some of the estates exceeded by a large amount the receipts in those estates but that he did not give Goldman any credit for discrepancies in his favor; that Goldman turned over to the Chicago Title and Trust Company, in compliance with the order of the circuit court, $75,000, but that he did not give Goldman credit for this amount because it was not identified with any particular estate; that he found Goldman liable to account in the Kirby, Cullen, Auer & Honecker estate for $4441.56; that he did not give Goldman credit in this estate for a check to Kirby's attorney for $1000, which it is admitted was paid to the attorney at Kirby's direction, because he did not find a canceled check showing payment. It was also shown that Goldman had paid to Honecker and to Auer each $500 more than the amount with which he was credited in the audit. The auditor testified that the ledger

318—7

was not complete when he examined it and that he did not find a disbursement sheet in all the cases he attempted to audit. The proof shows the leaves of this ledger floated around the offices of the trust company for a month and there is no proof that all of them were ever docked.

There are so many reasons apparent why the statement of the auditor was not admissible in this case that it seems unnecessary to state. any of them. The proof in this record shows clearly and without contradiction that the balance shown by the audit to be due in the Kirby, Cullen, Auer & Honecker estate is not correct. Under no rule of the law of evidence with which I am familiar is it possible to justify the admission of evidence of embezzlements in the other estates. It is elementary that evidence of an embezzlement wholly disconnected .with the one charged is not admissible, for the reason that it does not tend to establish the fact in controversy. (*People* v. *Ensor,* 310 Ill. 483; *People* v. *Spaulding,* 309 id. 292; *Kribs* v. *People,* 82 id. 425.) Nor can this unreliable mass of figures be held admissible on the theory advanced by the trial court and approved by the opinion of the majority of this court. Goldman was being tried for failing to pay over to his successor the balance remaining due the partnership estate. If the proof established the charge it was immaterial that he had the money to square the account. It would not have been competent for him to show that he had money on hand to meet the defalcation, and under no theory could the prosecution, as a part of its case in chief, show that he did not have on hand the embezzled funds. Furthermore, all of this evidence was inadmissible under the ruling of this court in *People* v. *Castree,* 311 Ill. 392. Substantially all of the evidence used by the prosecution was obtained in direct violation of sections 6 and 10 of our bill of rights and of the fourth and fifth amendments to the Federal constitution.

It was error to permit the State to prove that Goldman had his book-keeper change the accounts in estates other

than the one out of which the charge on trial arose, and that he had an arrangement with employees in the county building by which he secured appointments as receiver. Neither of these facts tended in any way to prove that he had embezzled funds from the Kirby, Cullen, Auer & Honecker estate.

It was error to permit the jury to take with them on their retirement papers which had not been read in evidence. (*People* v. *Clark,* 301 Ill. 428.) The constitutional provision that the accused shall have the right to meet the witnesses face to face means that all evidence in a criminal case must be produced in the presence of the accused. To permit the jury to take papers from the bar of the court and to read them for the first time while they are considering their verdict is to permit them to receive evidence after the cause has been submitted to them for decision and amounts to a denial to the accused of the right to appear and defend against such evidence and to be represented by counsel. It is very important for the accused and his counsel to be able to see exactly what impression is being made upon the jury by any portion of the evidence given on his trial, for the reason that it might be within his power to then introduce other evidence which might tend to disabuse the jury of a wrong impression, or the counsel by fair and legitimate argument might be able to convince the jury of the right view to be taken of such evidence.

I do not consider a receiver amenable to the provisions of section 81½ of the Criminal Code, under which this prosecution is brought. While the act mentions administrators, executors, guardians, conservators and trustees, who exercise official functions somewhat similar to those exercised by receivers, yet receivers are not mentioned in the act. I find no place in the statutes of this State where the legislature has used any of these terms in referring to a receiver, and it is an unusual and strained construction of statutory language to hold that this act includes receivers.

Statutes creating and defining crimes are not to be extended by intendment because the court thinks the legislature should have made them more comprehensive. (*United States* v. *Weitzel*, 246 U. S. 533, 38 Sup. Ct. 381; *State* v. *Hubbard*, 58 Kan. 797, 51 Pac. 290.) If the legislature intended to include receivers it would have said so, and would not have used the phrase "or other person acting in any fiduciary capacity" to describe a receiver. Unless there is something in the statute or its context which shows that the rule should not be applied, the well-recognized doctrine of *ejusdem generis* requires that the court, in the construction of statutes, hold general words following an enumeration of particular cases to apply only to cases of the same kind as those expressly mentioned. (*People* v. *Melville,* 265 Ill. 176; *City of Clinton* v. *Wilson,* 257 id. 580; *Shirk* v. *People* 121 id. 61.) Because the possession of property by a receiver is the possession of the court, (*Richards* v. *People,* 81 Ill. 551,) and because the relation of the receiver to the parties to whom he may in the end be liable to account is entirely different from that between an executor and the legatees under a will or a guardian and his ward, I think there is nothing in the context to warrant the conclusion that the legislature intended to include a receiver by following the specific words with these general words.

HEARD and DEYOUNG, JJ., also dissenting:

We concur in the dissenting opinion of Mr. Justice Thompson except as to the last paragraph thereof. We are of the opinion that a receiver is amenable to the provisions of section 81½ of the Criminal Code, under which this prosecution is brought.